UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TAMMY TWYFORD**,                                    Case No. 1:12 CV 796

              Plaintiff,                    Magistrate Judge James R. Knepp II

    v.                                    MEMORANDUM OPINION AND
                                         ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

              Defendant.

### INTRODUCTION

Plaintiff Tammy Twyford seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 17). For the reasons given below, the Commissioner's decision denying benefits is affirmed in part and remanded in part.

### PROCEDURAL BACKGROUND

On March 24, 2010, Plaintiff filed applications for DIB and SSI claiming she was disabled due to multiple impairments, including degenerative disc disease of the cervical spine, osteoarthritis in her cervical and lumbosacral spine, right shoulder impingement syndrome, left and right wrist carpal tunnel syndrome, depressive, panic, and post-traumatic stress disorders, alcohol and drug dependence and abuse, and other impairments. (Tr. 12, 167, 174). She alleged a disability onset date of March 9, 2009. (Tr. 167, 174). Her claims were denied initially (Tr. 109, 118) and on reconsideration (Tr. 128, 135). Plaintiff then requested a hearing before an administrative law judge

(ALJ). (Tr. 5). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 7, 33). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On April 1, 2012, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

Personal and Vocational History

Plaintiff was born April 10, 1966, and was 45 years old on the date of the ALJ's decision. (Tr. 37). Plaintiff graduated high school, received her cosmetology license, and attended business college for a year and half but did not obtain a degree. (Tr. 37, 74, 222). Plaintiff reported a substantial work history before her alleged onset date, which included jobs as a picker and cutter for a print shop, cashier and assistant manager at a convenience store, deli-cutter, welder, caregiver, and numerous temporary agency placements. (Tr. 37-49, 247-48). Plaintiff also worked as a janitor after her alleged onset date, but the ALJ determined this work did not rise to the level of substantial gainful activity. (Tr. 12). Her job duties as a janitor included vacuuming carpets, dusting, collecting trash, sweeping, mopping, cleaning toilets, sinks, and mirrors, carrying trash to a dumpster, and lifting and carrying cleaning supplies. (Tr. 249).

Concerning Plaintiff's daily activity, she prepared meals, vacuumed, washed clothing and dishes, watered plants, took care of her cat, and went to medical appointments. (Tr. 53, 270). She shopped for groceries once a month and was the primary caretaker of her granddaughter during part of her alleged onset date. (Tr. 268, 677). Plaintiff visited with her brother and a close friend occasionally and could drive independently. (Tr. 53). She said her hobbies were crocheting, sewing,

2

writing, and cooking, but she said could not do these activities very often because they hurt her arms and hands. (Tr. 270-71). Plaintiff said it was hard for her to walk, but she frequently walked two miles daily for exercise. (Tr. 22, 65, 838). She reported she could follow written instructions very well, spoken instructions well, got along very well with authority figures, and handled stress. (Tr. 272-73).

Medical History Related to Physical Impairments

Plaintiff testified lower back pain and lack of mobility in her left wrist primarily prevented her from working. (Tr. 57-63). Specifically, she reported lower back pain kept her from sitting for long periods and she could not handle with her left wrist. (Tr. 63, 271, 280). She also said degenerative arthrosis in her knees, post-traumatic stress disorder, and constant diarrhea contributed to her alleged disability. (Tr. 67). Plaintiff was treated for anal cancer after her alleged onset date, but has remained cancer-free since that time, and did not testify as to any difficulties arising from her cancer or treatment. (Tr. 18). The ALJ subsequently found Plaintiff's cancer was not a severe impairment, and Plaintiff did not assert the ALJ erred based on this finding.

Plaintiff began treating with Dr. John Zografakis on February 27, 2009, complaining of lower back pain and loose stools. (Tr. 317-18). On March 12, 2009, Dr. Zografakis determined Plaintiff suffered from squamous cell carcinoma in her anus. (Tr. 313). He told Plaintiff removing the lipoma may not offer her relief from her back pain, and acknowledged spinal x-rays showed degenerative joint changes but "no other obvious issue." (Tr. 318). Plaintiff also suffered from anal condyloma, which was being treated with topical agents. (Tr. 321). Dr. Zografakis recommended Plaintiff undergo surgery to remove the cancerous tumors. (Tr. 318). Plaintiff was admitted to Akron City Hospital for the removal of squamous cell carcinoma from her anal region. (Tr. 300-04). The

3

operation was successful, with complete excursion of the tumor, and Plaintiff's prognosis was good. (Tr. 325). Shortly after surgery, Plaintiff returned to Dr. Zografakis, who reported Plaintiff was doing well post-operatively. (Tr. 316).

Plaintiff went to Dr. Alison Shon on April 24, 2009, complaining of chest pain following yard work. (Tr. 349-52). Plaintiff also reported lower back pain. (Tr. 351). Physical examination revealed a positive straight leg raise test on the right and lumbosacral tenderness. (Tr. 350). She was treated with Tramadol and diagnostic testing. (Tr. 351).

On May 15, 2009, Plaintiff sought treatment from Dr. John C. Fondran for post-operative evaluation. (Tr. 334). He noted her post-operative site was almost completely healed, but there were some suspicious nodules in her rectal area, and her hemorrhoids were mildly enlarged. (Tr. 334). Dr. Fondran thought the nodules were condyloma as opposed to another lesion. (Tr. 334). He requested she follow-up in three months to schedule a biopsy. (Tr. 334).  She returned to Dr. Fondran on June 3, 2009 for a follow-up and said she had no complaints and was doing well. (Tr. 360). On July 5, 2009, Dr. Fondran discussed biopsy results of the post-operative nodules. (Tr. 361). He informed Plaintiff she had anal intraepithelial neoplasia, which was not cancerous, and she should follow-up in three months. (Tr. 361).

Plaintiff returned to Dr. Shon on June 12, 2009, complaining of right shoulder/paraspinal pain radiating down her right arm. (Tr. 346). Plaintiff's stress test was negative and lumbar/sacral x-rays showed mild degenerative changes. (Tr. 346). Her motor strength was 5/5 in her upper and lower extremities and she had normal sensation. (Tr. 347). On July 15, 2009, nerve conduction testing revealed Plaintiff suffered from mild to moderate right carpal tunnel syndrome. (Tr. 442).

Plaintiff saw Dr. Fondran on December 8, 2009, complaining of a painful mass in the

perianal area. (Tr. 388). A physical exam revealed a small nodule which Dr. Fondran opined was a healing thrombosed hemorrhoid. (Tr. 388).

On February 22, 2010, Plaintiff returned to Dr. Fondran with complaints of abdominal pain. (Tr. 386). Dr. Fondran informed Plaintiff her small bowel movement series and colonoscopy were negative, and testing for Crohn's disease was unremarkable. (Tr. 386, 396). Dr. Fondran found Plaintiff's symptoms consistent with irritable bowel syndrome. (Tr. 386).

Simultaneously, Plaintiff began receiving treatment for neck, bilateral shoulder, and right arm pain. On February 5, 2010, Plaintiff was examined by orthopedist Curtis Noel, M.D. (Tr. 532-33). Dr. Noel noted Plaintiff's complaints of neck, bilateral shoulder, and right hand numbness, and a previous diagnosis of mild to moderate carpal tunnel syndrome. (Tr. 532). Examination revealed positive impingement signs on the right side and numbness and tingling in Plaintiff's right hand. (Tr. 532). X-rays of Plaintiff's right and left shoulder were normal (Tr. 534-35), but an x-ray of Plaintiff's cervical spine showed significant degenerative changes (Tr. 536). At a follow-up appointment on February 15, 2010, Dr. Noel said Plaintiff's MRI results did not show significant gross herniation of disc material onto the nerve roots. (Tr. 558). He opined Plaintiff "[did] not need to have an immediate consultation with a spine surgeon" but said he would refer her to Dr. Ehrler within three-to-four weeks if her complaints of pain did not subside. (Tr. 558).

Because her pain persisted, Plaintiff went to Dr. Ehrler on March 19, 2010, for an orthopedic consultation. (Tr. 525). Her chief complaint was bilateral arm pain. (Tr. 525). On examination, Plaintiff had a normal gait, normal sensory responses, and full strength. (Tr. 525). Inspection, palpation, and range of motion were normal for her shoulders, elbows, wrists, hips, knees, and ankles. (Tr. 525). Dr. Ehrler concluded Plaintiff had bilateral foraminal stenosis at C4-5 and C5-6

and degenerative changes throughout her neck. (Tr. 525-26). Dr. Ehrler noted, "[A]t this point in time [Plaintiff] can't stand it [and] wants to have it fixed." (Tr. 526). He recommended cervical discetomy/fusion at C4-5 and C5-6, and Plaintiff underwent the surgery on April 6, 2010. (Tr. 526, 538-39).

At a follow-up visit with Dr. Ehrler on April 19, 2010, Plaintiff reported the pain in her arms was gone, but there was minor stiffness. (Tr. 521). An x-ray revealed Plaintiff's surgical hardware was in good position. (Tr. 522). At a second follow-up on May 14, 2010, Plaintiff again told Dr. Ehrler that her arm pain was gone, and she was very pleased. (Tr. 759). Dr. Ehrler reported Plaintiff had full strength and range of motion and her hardware was in good position. (Tr. 759).

On July 27, 2010, Dr. Ehrler and Plaintiff's physical therapist completed a report describing Plaintiff's functional abilities. (Tr. 580-81). They found Plaintiff could lift fifteen pounds occasionally and ten pounds frequently, and she could walk for up to two hours and stand for five-to-eight hours in an eight hour workday. (Tr. 580-81). They limited Plaintiff to occasional climbing, balancing, and crouching, but no kneeling or crawling. (Tr. 580). Plaintiff could frequently reach, stoop, handle, feel, push, and pull, but could not reach overhead with her right upper extremity "repetitively". (Tr. 580-81). They found Plaintiff would need breaks every two hours and a sit/stand option. (Tr. 581).

On June 15, 2010, state agency physician Paul Morton, M.D., reviewed Plaintiff's medical records and assessed her functional capacity. (Tr. 620-28). Dr. Morton found Plaintiff could perform light work with some restrictions, including only occasional climbing, stooping, crawling, and crouching, and frequent kneeling. A second state agency physician, Teresita Cruz, M.D., affirmed Dr. Morton's findings on December 20, 2010. (Tr. 696).

Plaintiff returned to Dr. Ehrler for a follow-up in August 2010. (Tr. 634). Plaintiff reported her back and legs hurt and requested epidural shots. (Tr. 634). On examination, Plaintiff had normal range of motion and stability, and full strength. (Tr. 634). Dr. Ehrler diagnosed spondylolosthesis without stenosis at L4-L5 and recommended physical therapy. (Tr. 634). At Plaintiff's request, Dr. Ehrler sent Plaintiff for a pain management consultation to receive epidural shots. (Tr. 634). Plaintiff saw pain management specialist Dr. Ayman Basali on August 31, 2010. (Tr. 669-72). Dr. Basali found Plaintiff had a limited range of motion in her spine, but had negative straight leg raise tests bilaterally. (Tr. 671). Dr. Basali administered a steroid injection to Plaintiff's lumbar spine, and Plaintiff reported her pain was 2/10 following the procedure. (Tr. 669). Plaintiff continued treatment with Dr. Basali through the date of hearing. (Tr. 828-30; 854-93).

On September 8, 2010, Plaintiff saw podiatrist Patrick Campbell, M.D., complaining of foot pain following a foot injury she suffered earlier that year while swimming. (Tr. 732-33). On examination, Plaintiff had full strength bilaterally in her lower extremities, and normal sensory and reflex responses. (Tr. 732-33). Dr. Campbell diagnosed a mild foot sprain, prescribed anti-inflammatory medication, and recommended an orthotic. (Tr. 733). At a follow-up visit on September 29, 2010, Plaintiff reported her pain had "greatly improved" and she could "do most of her normal activities". (Tr. 734).

X-rays of Plaintiff's hips and lumbar spine taken in December 2010 were normal, with no significant findings. (Tr. 717-19). An x-ray of Plaintiff's left knee taken February 2, 2011 revealed mild degenerative arthrosis, but was otherwise unremarkable. (Tr. 713). An x-ray of Plaintiff's wrist taken the same day revealed a fracture and calcification. (Tr. 714). Another x-ray of Plaintiff's left wrist, taken February 25, 2011, revealed further wrist conditions and Plaintiff underwent scaphoid

removal surgery on her left wrist on March 7, 2011 to repair it. (Tr. 740, 742).

Plaintiff went to John Detrich, M.D., a few days after her wrist surgery and reported minimal pain, and x-rays revealed her surgery was successful. (Tr. 748). Additional follow-ups revealed Plaintiff was healing well. (Tr. 749, 751, 753). On March 25, 2011, Dr. Detrich noted range of motion in Plaintiff's wrist was "markedly improved" and though Plaintiff requested more narcotics, Dr. Detrich told her she did not need them. (Tr. 753).

In August 2011, Plaintiff saw Dr. James Murphy for abdominal pain and he diagnosed her with irritable bowel syndrome. (Tr. 838-39). This diagnosis is consistent with Dr. Ramakrishina Bandi's findings in May 2010. (Tr. 617).

Medical History Related to Mental Impairments

In August 2010, Plaintiff began treatment with Dr. Barbara Michelson at Cornerstone Psychological Services. (Tr. 699-701, 710). The initial counseling was for drug and alcohol abuse issues and the treatment was part of a child reunification plan between Plaintiff and her granddaughter, of whom she had recently lost custody. (Tr. 699-701, 710). Plaintiff reported she was moderately depressed and experienced feelings of hopelessness. (Tr. 710). Dr. Michelson reported Plaintiff had made progress after six therapy sessions, and recommended continued therapy. (Tr. 710). Dr. Michelson continued to treat Plaintiff and generally rated Plaintiff's depression symptoms as "low" and no more than "moderate". (Tr. 807-811).

On December 8, 2010, consultive psychologist Dr. James Sunbury examined Plaintiff. (Tr. 674-77). Plaintiff said she never had mental health treatment until August 2010, and she was not on psychotropic medication. (Tr. 675). Dr. Sunbury reported Plaintiff was able to maintain concentration and train of thought throughout his examination, and noted she provided relevant and

coherent responses to his questions. (Tr. 676). He said she laughed at the mental status questionnaires, while simultaneously claiming she was typically in a depressed mood. (Tr. 676). Dr. Sunbury estimated Plaintiff's intellectual functioning was in the low-average range, with average judgement and low-average insight. (Tr. 676). He found Plaintiff's ability to relate to others was not impaired; her ability to understand, remember, and follow instructions was not impaired; her ability to maintain attention, concentration, persistence, and pace to perform routine tasks was not impaired; and her ability to withstand day-to-day work stress was moderately impaired. (Tr. 677). He diagnosed depressive disorder, not otherwise specified, and assigned a global assessment of functioning score (GAF) of 60[1]. (Tr. 677).

On December 15, 2010, state agency psychologist Tonnie Hoyle, Psy. D., examined Plaintiff's medical records and found Plaintiff was moderately limited in her abilities to complete a normal work day and work week without interruptions; respond appropriately to changes in a work setting; and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 679). Otherwise, Plaintiff was not significantly limited in the remainder of functional limitations in the categories of sustained concentration and persistence, understanding and memory, social interaction, and adaptation. (Tr. 678-79).

On February 3, 2011, Plaintiff was treated by psychiatrist Jitendra Cupala, M.D. (Tr. 715-16). Plaintiff's memory was intact; she had no suicidal ideation; her intelligence was average; she

---

1. The GAF scale represents a "clinician's judgment" of an individuals symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* A GAF score of 51–60 reflects moderate symptoms (e.g., flat effect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

had no delusions; her affect was normal; her insight and judgment were good; and there was no evidence of compulsive traits. (Tr. 716). Dr. Cupala assessed Plaintiff's GAF score was 70[2], indicating mild symptoms. (Tr. 716). She diagnosed Plaintiff with panic and post-traumatic distress disorders and alcohol dependence, and prescribed Effexor. (Tr. 716).

After treating with Dr. Cupala, Plaintiff returned to Dr. Michelson through November 2011. (Tr. 813-25). Dr. Michelson continued to rate Plaintiff's depression symptoms as "low" and no more than "moderate". (Tr. 813-25, 894-903). Dr. Michelson reported several times that Plaintiff was stable. (Tr. 894, 899, 901-03).

On June 2, 2011, psychiatrist Jennifer Jackson-Wohl evaluated Plaintiff's mental functional capacity. For each functional activity described, Dr. Wohl had the option to rate Plaintiff as "unlimited to very good", "good", "fair", or "poor". (Tr. 805). Unlimited or very good was defined as: "Ability to function in this area is more than satisfactory." (Tr. 805). Good was defined as: "Ability to function in this area is satisfactory." (Tr. 805). Fair was defined as: "Ability to function in this area is moderately limited but not precluded. May need special consideration and attention." (Tr. 805). Poor was defined as: "Ability to function is significantly limited." (Tr. 805). Dr. Wohl rated Plaintiff as "fair" or better in all areas of functional ability. (Tr. 805-06). Specifically, she noted Plaintiff had a very good ability to follow work rules and a good ability to use judgment, maintain attention and concentration, maintain regular attendance, deal with public, respond appropriately to changes in routine settings, and relate to co-workers and supervisors. (Tr. 805-06).

---

2. A GAF score of 61–70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *DSM-IV-TR*, at 34.

Dr. Wohl found Plaintiff had a fair ability to maintain attention and concentration for extended periods of two hour segments, function independently without supervision, work in coordination with others without being distracted, deal with work stress, complete a normal workday and workweek without interruptions from psychologically based symptoms, and understand and carry out complex or detailed job instructions. (Tr. 805-06).

VE Testimony

The VE testified at Plaintiff's hearing on November 22, 2011. (Tr. 75-99). The ALJ asked the VE whether any jobs in the national economy could be performed by a hypothetical individual of the same age, education, and work experience as Plaintiff, with the following limitations: they could lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk with normal breaks for about six hours in an eight hour workday; sit with normal breaks for six hours in an eight hour workday; frequently use upper extremities for pushing or pulling as in the operation of hand controls; frequently use lower extremities for pushing or pulling as in the operation of foot controls; frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, or crawl; frequently reach in all directions except only occasional overhead reaching bilaterally; frequently use both upper extremities for fingering and handling; limited to simple, routine, repetitive tasks involving only simple work-related decisions and in general relatively few work place changes; limited interaction with others in situations involving substantial negotiation, persuasion, or conflict resolution; cannot work in an environment with extremely high quotas, very strict time limits or deadlines, or extremely fast-paced production demands (such as those encountered in piece work on a fast moving assembly line). (Tr. 80-81). The VE testified such a person could perform Plaintiff's past relevant work as a cleaner, housekeeper, and deli-cutter, as

11

well as other jobs that existed in the national economy. (Tr. 81).

The ALJ asked the VE to consider the same hypothetical person as above, except she could only occasionally use her upper extremities for pushing and/or pulling as in the operation of hand controls; occasionally use her lower extremities for pushing and/or pulling as in the operation of foot controls; frequently use her dominant right upper extremity for fingering or handing; and occasionally use her non-dominant left upper extremity for fingering and handling. This hypothetical person represented the RFC the ALJ ultimately assessed for Plaintiff. (Tr. 16). The VE testified such a person could perform Plaintiff's past relevant work as a cleaner, housekeeper, and deli-cutter, as well as other jobs that existed in the national economy. (Tr. 83).

ALJ's Decision

The ALJ found Plaintiff had multiple severe impairments, including degenerative disc disease of the cervical spine; osteoarthritis in her cervical and lumbosacral spine; right shoulder impingement syndrome, right wrist carpal tunnel syndrome; left wrist carpal tunnel syndrome; depressive, panic, and post-traumatic stress disorders; alcohol and drug dependence and abuse; and other impairments. (Tr. 12-13). The ALJ found Plaintiff's impairments did not meet or medically equal a listing impairment. (Tr. 13-16). He then concluded Plaintiff maintained the RFC to meet the exertional demands of light work subject to additional limitations: lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk with normal breaks for about six hours in an eight hour workday; sit with normal breaks for six hours in an eight hour workday; occasionally use upper extremities for pushing and/or pulling as in the operation of hand controls; occasionally use lower extremities for pushing and/or pulling as in the operation of foot controls; frequently use dominant right upper extremity for fingering or handing; and occasionally use non-

dominant left upper extremity for fingering and handling; frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, or crawl; frequently reach in all directions except only occasional overhead reaching bilaterally; frequently use both upper extremities for fingering and handling; limited to simple, routine, repetitive tasks involving only simple work-related decisions and in general relatively few work place changes; limited interaction with others in situations involving substantial negotiation, persuasion, or conflict resolution; cannot work in an environment with extremely high quotas, very strict time limits or deadlines, or extremely fast-paced production demands (such as those encountered in piece work on a fast moving assembly line). (Tr. 16). Based on VE testimony, the ALJ determined this RFC allowed Plaintiff to perform her past relevant work as a deli-cutter, as well as other jobs that existed in the national economy. (Tr. 24-25). Accordingly, the ALJ found Plaintiff was not disabled.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as

13

substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only

14

if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff alleges the ALJ erred by failing to properly evaluate the opinions of treating psychiatrist Dr. Wohl and treating orthopedic surgeon Dr. Ehrler. (Doc. 16, at 12). Plaintiff also alleges the ALJ improperly evaluated her credibility.

***Treating Physician Rule***

An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.927(c). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability; (4) consistency; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record."

*Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

In addition, even if the treating physician's opinion is not entitled to "controlling weight," there is nevertheless a rebuttable presumption that it deserves "great deference" from the ALJ. *Rogers*, 486 F.3d at 242. Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* Failure to do so requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009).

Good reasons are required even when the conclusion of the ALJ may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows her physician has deemed her disabled and might be bewildered when told by an ALJ she is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id*.

## Dr. Wohl

Plaintiff argues the ALJ erred by giving the opinion of treating psychologist Dr. Wohl "significant weight", but then disregarding certain restrictions without explanation – namely, Dr. Wohl's opinion that Plaintiff only had a fair ability to maintain attention and concentration for extended periods, function independently, deal with work related stress, work in coordination with others, and complete a normal workday and work week without psychological interruptions. (Doc. 16, at 13; Tr. 805-06).

The ALJ gave Dr. Wohl's opinion "significant weight", found it consistent with the overall

16

evidence in the record, and said Dr. Wohl's assessment showed Plaintiff struggled in the areas of task persistence and her ability to tolerate work-place stress. (Tr. 15).  This explanation sufficiently described the weight he assigned Dr. Wohl's opinion required by the treating physician rule and touched upon several of the factors an ALJ is required to consider in 20 C.F.R.  §§ 404.1527(d) and 416.927(d) –  supportability, consistency, and specialization – which is all that is required. *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (While the stated reason for discounting a physician was brief, it was sufficient because it accounted for several factors in § 404.1527).

Plaintiff asserts the ALJ erred by not accounting for each restriction imposed by Dr. Wohl – specifically, restrictions related to her ability to concentrate and her ability to interact with her supervisors, co-workers, and the general public. (Doc. 16, at 14). However, the ALJ did account for these limitations. With regard to Dr. Wohl's assessment that Plaintiff had a fair ability to maintain attention and concentration for extended periods, the ALJ included a restriction limiting Plaintiff to simple, routine, repetitive tasks, involving only simple, work-related decisions, and relatively few work place changes. (Tr. 16). With regard to Dr. Wohl's assessment that Plaintiff has a fair ability deal with work related stress and complete a normal workday and work week without psychological interruptions, the ALJ limited Plaintiff to routine tasks and no interaction with others involving situations involving substantial negotiation, persuasion, or conflict resolution. (Tr. 16). The ALJ did not err because he used the word "others" as opposed to the buzz words "supervisors, co-workers, and the general public". And, in any event, Dr. Wohl opined Plaintiff had a good ability to use judgment, maintain concentration, deal with the public, and relate to co-workers and supervisors. (Tr. 805-06).

Plaintiff attempts to use Seventh Circuit case law to assign legal meaning to the terms "fair" or "moderate" in the Social Security context. (Doc. 16, at 14). However, this exercise is unnecessary,

17

as the definition of "fair" was defined on the face of Dr. Wohl's assessment. (Tr. 805). On the assessment, fair meant Plaintiff's ability to function was moderately limited but not precluded, and special consideration and attention may be needed. (Tr. 805-06). Based on this definition, coupled with Dr. Wohl's use of the same, there is nothing to suggest the ALJ's RFC assessment was inconsistent with Dr. Wohl's functional limitations, as fully described above.

In addition, as Defendant points out, there was other evidence in the record which supports the ALJ's RFC assessment. First, Plaintiff, by her own admission, reported she got along with authority figures "very well", and could follow written and spoken instructions "well". (Tr. 272). Next, Dr. Sunbury found Plaintiff's ability to understand, remember, and follow instructions was not impaired, and that her ability to maintain attention, concentration, persistence, and pace to perform routine tasks was not impaired. (Tr. 677). Further, Dr. Cupala found Plaintiff had no disjointed thinking, good judgment and insight, and assigned her a GAF score of 70, indicating only mild symptoms. (Tr. 716). These mild findings were reiterated by Plaintiff's treating psychologist, Dr. Michelson, who treated Plaintiff for approximately a year and repeatedly found Plaintiff's anxiety and depressive symptoms were "low" or "stable". (Tr. 811, 813, 815, 823, 825, 902-03). Accordingly, substantial evidence supports the ALJ's evaluation of treating psychiatrist Dr. Wohl.

**Dr. Ehrler**

Concerning Dr. Ehrler's opinion, Plaintiff argues the ALJ violated the treating physician rule because he failed to explain the weight he afforded Dr. Ehrler's opinion, failed to provide good reasons for discounting the opinion, and failed to evaluate the opinion under the factors required in 20 C.F.R.  §§ 404.1527(d) and 416.927(d). Plaintiff is correct.

Dr. Ehrler and Plaintiff's physical therapist, Ms. Krampf, provided a combined RFC assessment evidenced by their signatures. (Tr. 580-81). The ALJ recited the majority of limitations

noted in the assessment, less the restrictions requiring a sit/stand option and Plaintiff's need for breaks during the work day in addition to normal work breaks. (Tr. 19-20, 581). The ALJ then determined Dr. Ehrler's opinion was consistent with non-examining state agency consultant Dr. Morton's RFC assessment, and gave Dr. Morton's opinion significant weight (Tr. 20); however, the ALJ failed to assign any weight to Dr. Ehrler's opinion, and further failed to provide good reasons for not giving it controlling weight. Importantly, Dr. Ehrler's opinion was not, in fact, consistent with Dr. Morton's opinion. (*See* Tr. 20, 580-81, 620-28). Indeed, Dr. Morton explicitly discounted Dr. Ehrler's opinion in his RFC assessment by giving it "little weight". (Tr. 626).  First, Dr. Morton mistakenly indicated it was the sole assessment of Ms. Krampf, an unqualified source, then he discounted the opinion because it was done within two months of Plaintiff's surgery and failed to indicate if the restrictions were permanent or temporary. (Tr. 626).

Defendant argues the ALJ did not err because the limitations proposed by Dr. Ehrler which exceeded those in the ALJ's RFC were not supported by substantial evidence. Even so, the ALJ was required to provide good reasons for discounting Dr. Ehrler's opinion, regardless of whether the ALJ's conclusion was justified based on the record as a whole. *Wilson*, 378 F.3d at 544. While the outcome may be the same, the ALJ was required to explain the weight he assigned Dr. Ehrler's opinion, and if the weight was not controlling, he was required to provide good reasons for discounting it. *Wilson*, 378 F.3d at 544.

### *Credibility*

Plaintiff contends the ALJ incorrectly assessed Plaintiff's credibility because her subjective complaints were consistent, and fully support that she is disabled.

A claimant's subjective complaints can support a claim for disability, but there must also be

19

objective medical evidence in the record of an underlying medical condition. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). Further, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476 (citations omitted). On review, the Court is to "accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." *Id.* (citation omitted). Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *2.  In reviewing an ALJ's credibility determination, the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Plaintiff's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476.

An ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992).  Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms (especially pain) are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1. In evaluating credibility an ALJ considers certain factors:

(I) [A claimant's] daily activities;

(ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;

20

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [Plaintiff's] pain or other symptoms;

(vi) Any measures [Plaintiff] use or ha[s] used to relieve [a claimant's] pain or other symptoms; and

(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3).

Plaintiff argues the ALJ merely summarized medical evidence, but extrapolated certain portions to support his finding that Plaintiff was not credible. And given Plaintiff's complaints of pain, in combination with her serious medical conditions, Plaintiff asserts the ALJ erred by not properly evaluating Plaintiff's complaints of pain. Not so.

The ALJ found Plaintiff's stated symptoms were attributable to her medically determinable impairments, but the intensity, persistence, and limiting effects of those symptoms were not as restrictive as Plaintiff asserted. *Duncan v. Sec'y of Health & Human Servs.*, 801 F. 2d 847, 853 (6th Cir. 1986). The ALJ then explained, in over six pages, the diagnostic and clinical evidence supporting his credibility finding. (Tr. 18-23). While Plaintiff regularly complained of pain, these reports often coincided with unremarkable examination findings. For example, Plaintiff often had full strength in her upper and lower extremities, normal gait, and normal sensation while simultaneously complaining of significant pain. (Tr. 347, 525, 534-35, 558, 634, 732, 734, 755, 772). Likewise, Drs. Basali and Ehrler both noted negative straight leg raise tests that contradict Plaintiff's complaints of severe pain. (Tr. 671, 772).

Plaintiff's assertion of severe symptoms was also inconsistent with her daily activities. For

21

instance, Plaintiff frequently walked up to two miles a day (Tr. 65, 838), she prepared meals, vacuumed, washed clothes, and shopped for groceries. (Tr. 54, 677). She also had a cat, took care of house plants, drove frequently, and was able to drive long distances independently. (Tr. 22, 53, 55-56, 270). Moreover, Plaintiff was the primary caretaker of her granddaughter during part of her alleged disability period. (Tr. 268, 677). There was also evidence of Plaintiff performing yard work (Tr. 349),  and Plaintiff's own admission to Dr. Campbell that she could "do most of her normal activities now" shortly after spraining her foot while swimming. (Tr. 732, 734). Finally, the ALJ pointed to his own observation of Plaintiff to support his credibility finding. (Tr. 22). He noted Plaintiff testified she could do absolutely no handling with her left extremity – because of lack of motion in her left wrist (Tr. 63)  and pain in her shoulder (Tr. 65-67) – yet she was able to pick up, carry, and maneuver a large purse and rolling back pack with her left hand during the hearing. (Tr. 22). Accordingly, the ALJ's explanations for discrediting Plaintiff's testimony and subjective complaints of pain were reasonable and supported by substantial evidence in the record.

### CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds substantial evidence does not support the Commissioner's decision denying DIB and SSI benefits only to the extent that the ALJ failed to properly evaluate Dr. Ehrler's opinion pursuant to the treating physician rule. Therefore, the Court remands, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this opinion.

IT IS SO ORDERED.

      s/James R. Knepp, II
United States Magistrate Judge